

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Juan L. Aquino González y Otros<br><br>Recurridos<br><br>v.<br><br>Asociación de Empleados del Estado<br>Libre Asociado de Puerto Rico y otros<br><br>Peticionarios | Certiorari<br><br>2011 TSPR 77<br><br>182 DPR \_\_\_\_ |

Número del Caso: CC - 2007 - 201

Fecha: 25 de mayo de 2011

Tribunal de Apelaciones:

Región Judicial de San Juan, Panel IV

Panel Integrado por su presidente, Juez Arbona Lago, el Juez Miranda de Hostos y la Jueza Velázquez Cajigas

Abogados de la Parte Peticionaria:

Lcdo. Pedro E. Ortiz Álvarez
Lcdo. José Antonio Rodríguez Urbano

Abogado de la Parte Recurrida:

Lcdo. José E. Hernández Rodríguez
Lcda. Aida M. Medina Tolentino
Lcda. María M. Febus Ortiz

Materia: Revisión de Resolución Final del Panel Independiente de Arbitraje (PIA)

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Juan L. Aquino González y otros

    Recurridos

         v.                            CC-2007-201     Certiorari

Asociación de Empleados del
Estado Libre Asociado de
Puerto Rico y otros

    Peticionarios


Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo


San Juan, Puerto Rico, a 25 de mayo de 2011.


El caso que atendemos hoy nos brinda la oportunidad de pautar sobre dos asuntos de naturaleza novel en nuestro ordenamiento jurídico y ambos están relacionados con la Asociación de Empleados del Estado Libre Asociado de Puerto Rico (A.E.E.L.A. o Asociación). Como cuestión de umbral, debemos determinar cuál es el alcance de la revisión judicial dispuesta en la Sec. 38 de la Ley de la Asociación de Empleados del Estado Libre

Asociado de Puerto Rico (Ley de A.E.E.L.A.)[1] sobre el procedimiento de arbitraje en los casos de impugnación de candidatos en el proceso de elección de los delegados y de los puestos en los Cuerpos Rectores de la Asociación. A su vez, debemos resolver si los ex empleados de la A.E.E.L.A. pertenecen a la matrícula de dicha Asociación, específicamente al sector de ex empleados acogidos al seguro por muerte de la A.E.E.L.A.

Por los fundamentos que discutimos más adelante, se revoca la decisión del Tribunal de Apelaciones.

I

Con el propósito de disponer adecuadamente del caso es necesario que expongamos el cuadro fáctico que dio origen a las controversias que hoy atendemos. Veamos.

El 27 de abril de 2003 fue celebrada la elección para escoger los delegados que representarían al sector de ex empleados acogidos al seguro por muerte en la Asamblea de Delegados de la A.E.E.L.A.[2] En dicha elección fueron seleccionados los siguientes candidatos, quienes son los recurridos en el presente pleito: Juan L. Aquino González, Enita L. Moure de Lis, Aida M. Medina Tolentino, Herminio Rosado Marrero, Carlos R. Pagán Colón, José D. Rivera

---

[1] Ley Núm. 133 de 28 de junio de 1966, según enmendada, 3 L.P.R.A. sec. 863i.

[2] Según consta en el expediente del caso, en dicha elección participaron 334 votantes de los cuales 70 eran ex empleados de la A.E.E.L.A. Mientras, de la lista de 37 candidatos a delegados 10 eran ex empleados de la Asociación y de éstos 8 obtuvieron un mayor número de votos. Apéndice de la Petición de *certiorari*, pág. 196.

Caraballo, Pedro J. Hernández Navas, Gustavo Torres Mora, Andrés Figueroa Rodríguez, María E. Malavé Vicente, Hiram Vélez Lebrón, José Hernández Rodríguez, Juan Venegas Rivera, José G. Vargas Vélez y Ernesto Sánchez Huertas.[3] Valga mencionar que, según surge del expediente del caso, las primeras ocho personas arriba mencionadas fueron empleados de la Asociación y, a la fecha de la elección, estaban acogidos a la jubilación.[4]

Mediante unas querellas presentadas a finales de abril y principios de mayo de 2003, varios candidatos que no fueron electos impugnaron el resultado de la elección ante el Subcomité de Impugnaciones de la A.E.E.L.A (Subcomité de Impugnaciones).[5] En particular, alegaron que de forma ilegal se permitió la participación de votantes y candidatos a delegados (por el sector de ex empleados

---

[3] En lo pertinente, los resultados de la elección -según certificados por el Presidente del Comité Organizador- fueron los siguientes:

| Nombre | Cantidad de votos | Posición |
|---|---|---|
| Juan L. Aquino González | 184 | 1 |
| Enita L. Moure de Lis | 181 | 2 |
| Aida M. Medina Tolentino | 181 | 3 |
| Herminio Rosado Marrero | 181 | 4 |
| Carlos R. Pagán Colón | 181 | 5 |
| José D. Rivera Caraballo | 176 | 6 |
| Andrés Figueroa Rodríguez | 175 | 7 |
| María E. Malavé Vicente | 175 | 8 |
| Hiram Vélez Lebrón | 174 | 9 |
| José Hernández Rodríguez | 173 | 10 |
| Juan Venegas Rivera | 173 | 11 |
| José G. Vargas Vélez | 172 | 12 |
| Pedro J. Hernández Navas | 172 | 13 |
| Ernesto Sánchez Huertas | 170 | 14 |
| Gustavo Torres Mora | 165 | 15 |

Véase Apéndice de la Petición de *certiorari*, págs. 229-230.

[4] Íd., págs. 196, 231 y 258.

[5] Los querellantes fueron la señora Iris Vidot de Cubero y los señores Luis R. García de la Noceda, Alcides Ramos Vélez, Ladislao Olmedo Vidró y Pedro Rivera Chinchilla.

acogidos al seguro por muerte de la A.E.E.L.A.) que no pertenecen a la matrícula de la Asociación, como es el caso de los ex empleados de la A.E.E.L.A. Así, pues, el Subcomité de Impugnaciones notificó a los 37 candidatos que estuvieron en la papeleta acerca de las impugnaciones presentadas y les concedió un término para que expusieran su parecer.

Luego de evaluar el caso, el 16 de mayo de 2003 el Subcomité de Impugnaciones emitió una resolución mediante la cual concluyó que tanto las candidaturas de los ex empleados de la Asociación como la votación celebrada el 27 de abril de 2003 eran nulas, por lo que procedía un nuevo proceso de votación en el cual se excluirían como candidatos y votantes a los ex empleados de la A.E.E.L.A. El Subcomité de Impugnaciones señaló, además, que los ex empleados de la A.E.E.L.A. no tienen derecho a participar en el proceso de elecciones del sector de los ex empleados acogidos al seguro debido a que no pertenecen a la matrícula de dicha Asociación.[6] Específicamente, el Subcomité indicó que "la Asociación no es una agencia gubernamental, por lo cual los empleados y ex empleados de la Asociación no forman parte de la matrícula, según está definido en la Sección 4 de la Ley".[7]

---

[6] Apéndice de la Petición de *certiorari*, pág. 365.

[7] Íd., pág. 374. El Subcomité de Impugnaciones de la A.E.E.L.A. reiteró que "al permitir la participación de los ex empleados de la Asociación, como candidatos y votantes se vulneraron los derechos conferidos por la Ley Núm. 133… a los Ex empleados del Sector de las agencias gubernamentales que pertenecen a la matrícula". Íd.

Con el propósito de impugnar la determinación del Subcomité de Impugnaciones, el 22 de mayo de 2003 los recurridos presentaron una reclamación escrita ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos. Adscrito a dicha dependencia estaba un Panel Independiente de Arbitraje (P.I.A.) que atendería el asunto conforme dispone la Sec. 38 de la Ley de A.E.E.L.A., Ley Núm. 133 de 28 de junio de 1966, según enmendada, 3 L.P.R.A. sec. 863i.[8]

---

[8] Mientras la reclamación estaba pendiente de resolución por el Panel Independiente de Arbitraje (P.I.A.), los recurridos presentaron ante el tribunal de instancia una demanda de interdicto preliminar y permanente contra la Asociación y varios de sus oficiales directivos. En particular, los recurridos solicitaron que: (1) se prohibiera la celebración de una segunda elección -pautada para el 29 de junio de 2003- con el fin de elegir a los delegados del sector de ex empleados, ello hasta tanto el P.I.A. resolviera la reclamación y ésta adviniera firme, y (2) se les certificara como delegados del sector de ex empleados. No obstante, el 27 de junio de 2003 el foro de instancia denegó la petición de interdicto, pues entendió que los recurridos no sufrirían un daño irreparable al no ser certificados inmediatamente, ello debido a que el asunto de la impugnación aún estaba ante el P.I.A. Asimismo, concluyó que los recurridos tenían un remedio en ley: impugnar la nueva elección.

Ante la decisión del tribunal de instancia, el 29 de junio de 2003 la Asociación celebró una segunda elección de delegados, pero esta vez sin la participación de sus empleados y ex empleados. Finalmente, la A.E.E.L.A. certificó a los delegados electos en esa segunda elección. Inconformes con el dictamen del foro de instancia, en julio de 2003 los recurridos presentaron un recurso de apelación (KLAN0300898) ante el Tribunal de Apelaciones. En septiembre de 2004, dicho foro apelativo aun cuando reconoció que la controversia no estaba madura, pues el asunto de la certificación de los delegados dependía de que el P.I.A. emitiera una decisión final sobre la impugnación de la elección, resolvió que la Asociación estaba obligada -conforme a la Sec. 5(a) de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862d- a reconocer a los recurridos como miembros de la Asamblea de Delegados de la Asociación.

Así las cosas, el Tribunal de Apelaciones denegó la solicitud de reconsideración presentada por la Asociación y los oficiales directivos demandados, y en diciembre de 2004 éstos presentaron un recurso de *certiorari* ante este Foro (CC-2004-1173). En síntesis, éstos plantearon que la Ley de A.E.E.L.A. no les obligaba a reconocer a los aquí recurridos como delegados hasta tanto se resolviera de manera final y firme la impugnación de la primera elección, ya que estos últimos nunca fueron certificados por el jefe de la agencia.

En abril de 2005 denegamos el recurso presentado y más adelante también denegamos la primera moción de reconsideración. Posteriormente, en mayo de 2005 accedimos a reconsiderar y expedimos el

El 24 de febrero de 2006 el P.I.A. -en votación de dos a uno- emitió un laudo de arbitraje mediante el cual desestimó la determinación emitida por el Subcomité de Impugnaciones y declaró nula la elección efectuada el 29 de junio de 2003.[9] Además, el P.I.A. ordenó que la Asociación certificara a los recurridos como delegados a la Asamblea de Delegados de la A.E.E.L.A. por el sector de ex empleados acogidos al seguro por muerte. Entendió el P.I.A. que los recurridos tenían derecho a participar en el proceso de elecciones del mencionado sector, ya fuera como votantes y candidatos a delegados a la Asamblea de Delegados de la A.E.E.L.A. o como candidatos a puestos directivos en los Cuerpos Rectores de dicha Asociación.[10]

El 22 de marzo de 2006 la A.E.E.L.A. recurrió ante el tribunal de instancia para revisar la resolución final del P.I.A.[11] Por su parte, en abril de 2006 los aquí recurridos

---

auto solicitado. Además, ordenamos la paralización de los procedimientos y la reunión de la Asamblea de Delegados pautada para el 12 de mayo de 2005.

[9] El P.I.A. estuvo compuesto por Elizabeth Guzmán Rodríguez, José R. Colón Burgos y Betty Ann Mullins Matos. Esta última emitió una opinión disidente.

[10] En su opinión disidente, la árbitra Betty Ann Mullins Matos expone que está de acuerdo con la decisión del Subcomité de Impugnaciones acerca de que la participación de los ex empleados de la Asociación en la elección de delegados celebrada en abril de 2003 fue contraria a la propia Ley de A.E.E.L.A.
    La árbitra Mullins manifiesta que "[i]ndependientemente que éstos se hayan jubilado y estén acogidos al seguro por muerte, éstos siguen estando excluidos debido a que AEELA no está catalogada como una agencia gubernamental". Por todo lo cual, Mullins entiende que el proceso de elección fue nulo debido a que no procedía la participación de estos ex empleados como candidatos a delegados a la Asamblea de Delegados de la Asociación. Apéndice de la Petición de *certiorari*, págs. 235-236.

[11] Juan Aquino González, et al. v. Asociación de Empleados del Estado Libre Asociado, et al., Civil Núm. K AC2006-1738.

se opusieron a dicha petición de revisión judicial. Luego de evaluar ambos escritos, en mayo de 2006 el foro de instancia expresó –mediante resolución– que lo prudente era esperar la disposición final que emitiera esta Curia en el recurso presentado en diciembre de 2004 por la Asociación y los oficiales directivos demandados (caso CC-2004-1173).

Así las cosas, el 3 de mayo de 2006 emitimos una sentencia mediante la cual resolvimos el caso CC-2004-1173. Con dicho dictamen revocamos la decisión del Tribunal de Apelaciones y desestimamos el recurso presentado por la Asociación y los oficiales directivos demandados. En esa determinación señalamos que el Tribunal de Apelaciones erró al concluir que la A.E.E.L.A. tenía que reconocer y juramentar como delegados a los aquí recurridos. En particular, indicamos que a éstos "no les asiste el derecho a ser convocados y reconocidos en la Asamblea de Delegados hasta tanto se resuelva de manera final y firme la reclamación presentada por ellos ante el [P.I.A.]".[12]

Mediante sentencia enmendada del 28 de septiembre de 2006, el tribunal de instancia confirmó el laudo arbitral emitido por el P.I.A. Concluyó que de las acciones de dicho Panel no surgía alguna de las excepciones que permitiera la intervención del foro revisor con el laudo de arbitraje. Es decir, no surgía: fraude, conducta impropia, falta de debido procedimiento de ley en

---

[12] Apéndice de la Petición de *certiorari*, pág. 122.

la celebración de la vista, ausencia de jurisdicción, violación a la política pública u omisión de resolver todas las cuestiones en controversia. Así, pues, el tribunal de instancia siguió la norma de abstención judicial y sostuvo la validez del laudo de arbitraje, por lo que ordenó que la Asociación certificara a los candidatos electos el 27 de abril de 2003 como delegados a la Asamblea de Delegados de la A.E.E.L.A.

Luego de que la Asociación solicitara reconsideración y los recurridos se opusieran, el foro de instancia declaró no ha lugar la moción. Inconforme con la decisión del tribunal de instancia, el 25 de octubre de 2006 la A.E.E.L.A. presentó un recurso de *certiorari* ante el Tribunal de Apelaciones y en noviembre de 2006 los recurridos se opusieron al mismo.

Mediante resolución del 19 de enero de 2007, el Tribunal de Apelaciones denegó la expedición del recurso presentado por la Asociación. Aunque en su determinación el Tribunal de Apelaciones no establece expresamente que los empleados retirados de la A.E.E.L.A. pertenecen a la matrícula de dicha Asociación, ese foro indicó que "[e]stá claro que una vez se jubilan, los empleados de AEELA son jubilados dentro de un plan de retiro del gobierno de Puerto Rico, con iguales prerrogativas, derechos y obligaciones que todos los demás jubilados allí adscritos. Es decir, una vez jubilado el empleado del ELA,

al igual que el empleado de AEELA, gozan de los mismos derechos y prerrogativas, sin distinción alguna".[13]

En cuanto a la controversia sobre si el trámite arbitral dispuesto en la Sec. 38 de la Ley de A.E.E.L.A., *supra*, constituye un procedimiento de arbitraje ordinario o un procedimiento especializado similar al trámite de una revisión administrativa, el Tribunal de Apelaciones concluyó que se trata de un procedimiento de arbitraje ordinario. Además, apuntó lo siguiente: "[e]n la medida en que la propia ley habilitadora de AEELA exige que el PIA establezca determinaciones de hecho y conclusiones de derecho en todo laudo, nos indica que el arbitraje es uno conforme a derecho, porque de lo contrario tales requisitos no tendrían significado alguno".[14]  Luego de examinar las determinaciones de hechos y las conclusiones de derecho emitidas por el P.I.A., el Tribunal de Apelaciones entendió que no había motivo para intervenir con el laudo arbitral, tal como lo hizo el foro de instancia.

En desacuerdo con el dictamen del Tribunal de Apelaciones, en febrero de 2007 la A.E.E.L.A. solicitó reconsideración, mas ese foro apelativo denegó la moción. Así, la Asociación recurrió ante esta Curia el 16 de marzo

---

[13] Apéndice de la Petición de *certiorari*, pág. 28.  Asimismo, el Tribunal de Apelaciones expresó que "la provisión que excluye a los empleados activos de AEELA de participar en los cuerpos rectores de la Asociación, no perdura cuando el empleado de AEELA deja de serlo a su jubilación, para convertirse en retirado con derecho a la pensión de la Asociación".  Íd.

[14] Íd., pág. 29.

de 2007 mediante recurso de *certiorari* y señala que el Tribunal de Apelaciones erró:

(1) al resolver que los recurridos son miembros de la matrícula de la A.E.E.L.A. para el sector de ex empleados acogidos, aun cuando la ley expresamente los excluye;

(2) al determinar que el procedimiento de arbitraje establecido en la Sec. 38 de la Ley de A.E.E.L.A. es uno ordinario y no *sui géneris* como se establece en la propia ley; y

(3) al confirmar la sentencia del Tribunal de Primera Instancia que denegó el recurso de revisión por no encontrar alguna excepción bajo la Ley de Arbitraje Comercial del Código de Enjuiciamiento Civil para la revisión judicial de un laudo arbitral.

En abril de 2007 acordamos expedir el auto de *certiorari* y en ese mismo mes los recurridos se opusieron al recurso. La Asociación presentó su alegato en julio de 2007 y, luego de una prórroga, los recurridos presentaron el suyo en septiembre de 2007.

Contando con el beneficio de la comparecencia de ambas partes y luego de ponderar sus respectivos argumentos, estamos en posición de resolver los asuntos planteados ante nuestra consideración.

II

En la discusión del primer error señalado, la Asociación expone que el problema principal con la decisión del Tribunal de Apelaciones es que ésta incorpora de manera impermisible a los recurridos como miembros de la matrícula de la Asociación, ello a pesar de que la propia Ley de A.E.E.L.A. los excluye. Además, aduce que el

Tribunal de Apelaciones erró al expresar que no existe diferencia entre los recurridos (ex empleados que laboraron en la Asociación) y los acogidos al sistema de retiro del Gobierno de Puerto Rico que hayan trabajado en agencias gubernamentales, pues -según ese foro apelativo- todos gozan de las mismas prerrogativas, derechos y obligaciones. Ante esto, la A.E.E.L.A. señala lo siguiente:

> **No hay duda que el legislador quiso concederle beneficios a los empleados y ex empleados de AEELA dentro de un marco enteramente laboral. Sin embargo, la intención del legislador es clara cuando se trata de los cuerpos rectores de la AEELA. En ese caso, el legislador fue claro al excluir expresamente a los empleados y ex empleados de la definición de matrícula de la Asociación.** Si la intención legislativa hubiera sido otra, el legislador no hubiera excluido a la AEELA de la definición de "agencia gubernamental". (Énfasis en el original y citas omitidas.)[15]

Añade la Asociación que el Tribunal de Apelaciones no tomó en consideración lo dispuesto en el inciso 4 de la Sec. 4 de la Ley de A.E.E.L.A.[16] en torno a lo que comprende la categoría de "socio acogido al seguro por muerte", sino que optó por una interpretación aislada e incorrecta del inciso (e) de la Sec. 2 de la Ley de A.E.E.L.A.[17] referente a lo que significa "socio acogido pensionado". Por tal razón, la Asociación plantea que corresponde examinar la Ley de A.E.E.L.A. en su totalidad y no por disposiciones

---

[15] Alegato de la parte peticionaria, pág. 11.

[16] 3 L.P.R.A. sec. 862c.

[17] 3 L.P.R.A. sec. 862a.

aisladas para así determinar quiénes están legitimados para ser miembros de la matrícula de la Asociación.

Por su parte, los recurridos plantean -en cuanto al primer error- que la Ley de A.E.E.L.A. a quienes excluye expresamente como miembros de la Asociación es a los empleados que laboran en ésta, pero no así a los ex empleados de la Asociación. Aducen que una vez los empleados de la A.E.E.L.A. se acogen a la jubilación entonces forman parte de un grupo distinto, pues se convierten en personas jubiladas dentro del plan de retiro del Gobierno de Puerto Rico. Así, pues, señalan que "[s]iendo un grupo distinto, no forman parte de ninguna agencia en particular, ni mantienen lazo alguno con los directivos de las agencias para la cual laboraron, ni tienen in[j]erencia alguna en las decisiones de las agencias para las cuales trabajaron…".[18]

Asimismo, los recurridos reiteran lo expuesto por el Tribunal de Apelaciones en cuanto a que no existe diferencia entre los ex empleados de la A.E.E.L.A. y los demás ex empleados del gobierno, por lo que "TODOS los jubilados adscritos a los Sistemas de Retiro de Puerto Rico tienen los mismos derechos y obligaciones y reciben los mismos beneficios".[19] (Mayúsculas en el original.) También expresan que la definición fundamental que debe aplicarse es la referente a "socio acogido pensionado" dispuesta en

---

[18] Alegato de la parte recurrida, pág. 10.

[19] Íd., pág. 11.

el inciso (e) de la Sec. 2 de la Ley de A.E.E.L.A., *supra*. Ello debido a que siempre se les ha reconocido como socios acogidos pensionados-miembros del sector de ex empleados acogidos al seguro por muerte de la A.E.E.L.A. y "[c]omo tales han participado en todas las anteriores Asambleas como votantes y como candidatos a delegados por el Sector de Ex empleados Acogidos; han sido electos delegados a la Asamblea de Delegados y miembros de la Junta de Directores de la AEELA".[20]

En la discusión conjunta de los errores dos y tres, la Asociación expone que se debe aclarar cuál es el alcance de la revisión judicial dispuesta en la Sec. 38 de la Ley de A.E.E.L.A., *supra*, sobre el procedimiento de arbitraje en los casos de impugnación de candidatos en el proceso de elección de los delegados y de los puestos en los Cuerpos Rectores de la Asociación. Específicamente, la A.E.E.L.A. señala que no se trata de un procedimiento de arbitraje ordinario (en el ámbito comercial o laboral), sino de un procedimiento *sui géneris* por sus características particulares. En particular, expresa que dicho procedimiento de arbitraje -integrado a la Ley de A.E.E.L.A. mediante la aprobación de la Ley Núm. 142 de 21 de diciembre de 1994 (Ley 142)- es "uno bien delimitado, donde aun cuando se busca la tramitación de las reclamaciones de una manera rápida y confiable no se

---

[20] Alegato de la parte recurrida, pág. 12.

caracteriza por la finalidad y obligatoriedad instantánea que caracteriza el arbitraje ordinario".[21]

La Asociación enfatiza en que no existe duda de que la intención del legislador al redactar la mencionada Ley 142 y de la Asamblea de Delegados de la A.E.E.L.A. al aprobar en 1995 el "Reglamento de Referimiento al Árbitro del Negociado del Conciliación y Arbitraje de los Procesos de Impugnación de Elección de los Delegados y de los Puestos de los Cuerpos Rectores de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico" fue "ajustar las determinaciones del PIA a que fueran conforme a derecho, permitiendo también una plena revisión judicial de los méritos de las decisiones".[22]  Añade la A.E.E.L.A. que la existencia del recurso de revisión judicial no es algo vano ni fútil, sino que responde a la necesidad de que la parte adversamente afectada por la resolución final u orden del P.I.A. pueda acceder al foro judicial para que se corrija cualquier error en la aplicación del derecho.[23]

Para culminar, la Asociación planteó que el Tribunal de Apelaciones cometió error manifiesto al resolver que "aun cuando el laudo del PIA tiene que ser conforme a

---

[21] Alegato de la parte peticionaria, págs. 21-22.

[22] Íd., págs. 23-24.

[23] Íd., pág. 26.

derecho, los tribunales no están obligados a revisar las conclusiones jurídicas formuladas por el Panel".[24]

Mientras, en relación con el segundo y tercer señalamiento de error, los recurridos exponen que el Tribunal de Apelaciones actuó correctamente al denegar la expedición del recurso presentado, pues dicho foro entendió que el tribunal de instancia no había incidido en su decisión de "respetar la abstención judicial de fundamentos para revisar el Laudo de Arbitraje del PIA".[25]

III

A. La institución del arbitraje en Puerto Rico: sus orígenes, definiciones, desarrollo, política pública y la revisión del laudo arbitral

Según nos comenta el profesor David M. Helfeld en su abarcador artículo de revista jurídica titulado "La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico", el arbitraje antecede a los sistemas de tribunales de justicia y ha coexistido con éstos, en ocasiones como una institución colaboradora y en otras con la hostilidad o indiferencia de los jueces.[26] Helfeld expresa, además, que el arbitraje se refiere a cuando las dos partes en controversia someten su disputa -de forma voluntaria- a un

---

[24] Alegato de la parte peticionaria, pág. 27.

[25] Alegato de la parte recurrida, pág. 16.

[26] D.M. Helfeld, La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico, 70 Rev. Jur. U.P.R. 1, 3 (2001).

tercero reconocido por ambos como imparcial y capacitado para decidir de manera justa, quien oye las respectivas posiciones y resuelve el conflicto mediante un laudo que tiene efecto final y obligatorio entre las partes.[27]

Por su parte, el profesor Demetrio Fernández Quiñones plantea que el origen de la institución del arbitraje se remonta a los tiempos bíblicos y al inicio de las civilizaciones en Grecia y Roma.[28] Explica que en el proceso de arbitraje "las partes en disputa someten y presentan su caso ante un tercero neutral que está investido con la facultad de rendir una decisión".[29]

En términos generales, se ha definido el arbitraje como el "procedimiento para resolver controversias, sometiéndolas a un árbitro o a un cuerpo de árbitros, para luego de considerar las pruebas, emitir un laudo".[30] Entonces, podría señalarse que el arbitraje es un método alterno para la solución de conflictos, cuyo propósito va dirigido a que las partes presenten sus controversias ante un ente neutral (un árbitro o un panel de árbitros) con autoridad para adjudicar e imponer una decisión a las partes.

---

[27] Helfeld, La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico, supra, pág. 5.

[28] D. Fernández Quiñones, El arbitraje obrero-patronal, Bogotá, Ed. Forum, 2000, pág. 3.

[29] Íd., pág. 9.

[30] I. Rivera García, Diccionario de Términos Jurídicos, 2da ed., New Hampshire, Ed. Equity, 1985, pág. 18.

Se ha expresado que algunas de las ventajas de someter una controversia o reclamación al procedimiento de arbitraje son las siguientes: la pericia del ente neutral respecto a la materia objeto de disputa, la privacidad e informalidad en los procedimientos, los bajos costos del proceso y la rapidez en la toma de decisiones.[31]

El arbitraje puede ser obligatorio o voluntario. En particular, se entiende que el arbitraje obligatorio es aquel ordenado por una agencia gubernamental o requerido por una ley.[32]  Mientras, el arbitraje voluntario es aquel que ocurre por voluntad de las partes.[33]  En Colón Molinary v. A.A.A.,[34] acuñamos el concepto 'arbitraje compulsorio legislativo' con el propósito de "diferenciar la situación en que el mecanismo de arbitraje es de naturaleza obligatoria por así [haberlo acordado] las partes, de cuando su carácter imperativo es por razón de una ley especial".

En Puerto Rico existen dos tipos principales de arbitraje voluntario: el arbitraje comercial y el arbitraje

---

[31] S. Goldberg y otros, Dispute Resolution: Negotiation, Mediation, and Other Processes, 4ta ed., Nueva York, Ed. Aspen, 2003, pág. 210; Fernández Quiñones, op. cit., págs. 23-27. Véase, además, C.O.P.R. v. S.P.U., res. el 28 de marzo de 2011, 2011 T.S.P.R. 47, pág. 23 n. 18, 181 D.P.R. ___.

[32] Rivera García, op. cit., pág. 19.

[33] Black´s Law Dictionary, 7ma ed., St. Paul, Ed. West Publishing Co., 1999, pág. 100.

[34] 103 D.P.R. 143, 146 n. 1 (1974).  Véase, también, C.O.P.R. v. S.P.U., supra, pág. 25 n. 19.

industrial u obrero-patronal.[35] Algunas de las principales diferencias prácticas entre ambos tipos son las siguientes: (1) mientras el arbitraje comercial trata sobre dos o más partes entre las que existe alguna causa de acción y acuerdan que un árbitro o un panel resuelva la controversia sin tener que acudir al foro judicial, en el arbitraje obrero-patronal no se requiere necesariamente la existencia de una causa de acción entre las partes, y (2) mientras el arbitraje comercial está disponible para todas aquellas personas que interesen arbitrar cualquier controversia objeto de una causa de acción existente entre ellas o acordar que cualquier controversia futura entre ellas se resolverá mediante arbitraje, el arbitraje obrero-patronal sólo está a la disposición de los patronos y las organizaciones obreras en representación de determinado trabajador o grupo de trabajadores.[36]

Al constituir el arbitraje comercial y el arbitraje obrero-patronal los dos tipos principales de arbitraje voluntario en Puerto Rico, consecuentemente los desarrollos más significativos en el tema del arbitraje en nuestra Isla han ocurrido en estas dos áreas. [37] En particular, el desarrollo que se ha generado en estos dos campos surge como consecuencia de la legislación y

---

[35] H.R. Cancio, El arbitraje obrero-patronal en Puerto Rico, Río Piedras, Instituto de Relaciones del Trabajo, 1953, pág. 10.

[36] Íd., pág. 11.

[37] Helfeld, La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico, supra, pág. 6.

jurisprudencia interpretativa en torno al arbitraje comercial, y las normas pautadas en la jurisprudencia federal y puertorriqueña en cuanto al arbitraje laboral.[38] Para el profesor Helfeld, entre el conjunto de factores determinantes en el desarrollo del arbitraje en Puerto Rico "está la judicatura que ha sido decisiva en la creación del cuerpo de normas dentro de las cuales se han desarrollado los sistemas arbitrales".[39]

En nuestro ordenamiento legal, el arbitraje comercial se rige por la "Ley para autorizar la celebración de convenios de arbitraje comercial en Puerto Rico", mejor conocida como la Ley de Arbitraje Comercial (Ley 376).[40] Dicho estatuto adoptó como modelo la legislación de varios estados de Estados Unidos y la propia Ley de Arbitraje de Estados Unidos (9 U.S.C.A. sec. 1 *et seq*).[41] Al constituir la Ley 376 una "criatura del derecho norteamericano", es muy común que acudamos a la jurisprudencia federal y estatal para que ambas nos sirvan

---

[38] Helfeld, La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico, *supra*, págs. 6, 53-55.

[39] Íd., pág. 7.

[40] Ley Núm. 376 de 8 de mayo de 1951, según enmendada, 32 L.P.R.A. sec. 3201 *et seq*. Previo a la aprobación de esta ley, en Puerto Rico rigió -en materia de arbitraje- el Derecho Español desde 1881. Primero fue la Ley de Enjuiciamiento Civil para España y Ultramar de 13 de mayo de 1855, enmendada por el R.D. de 3 de febrero de 1881 y extendida a Puerto Rico el 25 de septiembre de 1885, y luego fue la Ley de Arbitraje de Derecho Privado de 22 de diciembre de 1953. Véase Seafarers Inter´l Union v. Tribl. Superior, 86 D.P.R. 803, 812 n. 2 (1962).

[41] Autoridad sobre Hogares v. Tribl. Superior, 82 D.P.R. 344, 359 (1961); Helfeld, La jurisprudencia creadora: factor determinante en el desarrollo del derecho de arbitraje en Puerto Rico, *supra*, pág. 55.

de guía en la resolución de los casos en la jurisdicción local.[42]

De acuerdo con el Art. 1 de la Ley 376, 32 L.P.R.A. sec. 3201, dos o más partes podrán convenir por escrito en someter a arbitraje cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha de dicho convenio, o podrán incluir en un convenio por escrito una disposición para resolver mediante arbitraje cualquier controversia que en el futuro surgiese entre ellos de dicho acuerdo o en relación con éste.[43]

En varias ocasiones hemos reafirmado que el arbitraje es una figura jurídica inherentemente contractual, por lo que dicho mecanismo se puede exigir únicamente cuando las partes así lo han pactado y se haya hecho constar por escrito según dispone el Art. 1 de la Ley 376, *supra*.[44] No obstante, el Art. 29 de la Ley 376[45] expresamente dispone que dicho estatuto no aplicará a los convenios de arbitraje entre patronos y empleados.  Es decir, la Ley de Arbitraje

---

[42] Municipio Mayagüez v. Lebrón, 167 D.P.R. 713, 721 (2006).  Véase, además, S.L.G. Méndez-Acevedo v. Nieves Rivera, res. el 22 de junio de 2010, 2010 T.S.P.R. 105, pág. 10, 179 D.P.R. ___.

[43] Véanse: Martínez Marrero et al. v. González Droz et al., res. el 11 de enero de 2011, 2011 T.S.P.R. 3, pág. 7, 180 D.P.R. ___; S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 25; Crufon Const. v. Aut. Edif. Púbs., 156 D.P.R. 197, 204 (2002).

[44] VDE Corporation v. F&R Contractors, res. el 15 de octubre de 2010, 2010 T.S.P.R. 210, pág. 11, 180 D.P.R. ___; S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 7; Municipio Mayagüez v. Lebrón, *supra*, pág. 720; Crufon Const. v. Aut. Edif. Púbs., *supra*, pág. 205; U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133, 144 (1994); Rivera v. Samaritano & Co., Inc., 108 D.P.R. 604, 606-607 (1979).

[45] 32 L.P.R.A. sec. 3229.

Comercial excluye específicamente el arbitraje obrero-patronal.[46]

Conforme establece el Art. 1 de la Ley 376, *supra*, el acuerdo entre las partes será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio. Específicamente, el Art. 22 de la Ley 376,[47] establece los fundamentos por los cuales el tribunal podrá –previo aviso y vista- revocar el laudo. Estos son:

> (1) Cuando se obtuvo mediante corrupción, fraude u otro medio indebido;
>
> (2) Cuando hubo parcialidad o corrupción evidente de los árbitros o cualquiera de ellos;
>
> (3) Cuando los árbitros actuaren erróneamente al rehusar posponer la vista luego de mostrarse causa justificada para ello, o al rehusar oír evidencia pertinente y material a la controversia, o cuando incurrieren en cualquier error que perjudique los derechos de cualquiera de las partes;
>
> (4) Cuando los árbitros se extendieren en sus funciones o cuando el laudo emitido no resolviera en forma final y definitiva la controversia sometida; y
>
> (5) Si no hubo sumisión o convenio de arbitraje válido y el procedimiento se inició sin diligenciar la notificación de intención de arbitrar (Art. 11 de la Ley 376) o la moción para obligar el arbitraje (Art. 4 de la Ley 376).[48]

En lo que respecta al arbitraje obrero-patronal, hay que indicar que nuestro ordenamiento legal aún no

---

[46] Fernández Quiñones, op cit., pág. 529. Véase, también, Autoridad sobre Hogares v. Tribl. Superior, 82 D.P.R. 344, 359 (1961).

[47] 32 L.P.R.A. sec. 3222.

[48] Véase, además, C.R.U.V. v. Hampton Dev., 112 D.P.R. 59, 62-63 (1982).

cuenta con un estatuto que regule dicho campo.[49]  Ante esa ausencia de guías estatutarias, nos comenta el profesor Helfeld que "tanto el Tribunal Supremo de Puerto Rico como el Tribunal Supremo Federal han asumido la responsabilidad de crear las normas para regir las relaciones entre el arbitraje obrero-patronal y el sistema de derecho". [50] Ante la falta de un cuerpo legal aplicable y en cumplimiento con el Art. 7 del Código Civil de Puerto Rico[51] referente a que los tribunales tienen el deber de resolver controversias a pesar del "silencio, obscuridad o insuficiencia de la ley", en la década del 40 comenzamos a pautar las normas jurídicas que han regido hasta la actualidad las controversias sobre arbitraje obrero-patronal en la Isla.

A mediados de los años 40, en el caso Ríos v. Puerto Rico Cement Corp., 66 D.P.R. 470, 477 (1946), indicamos que "[u]n laudo de arbitraje ocupa una posición muy similar a la de una sentencia o decreto judicial".  También señalamos que, como regla general, un laudo de arbitraje puede ser impugnado o anulado si existe algún defecto o insuficiencia en la sumisión o en el laudo mismo que lo invalide, o

---

[49] Cancio, op. cit., pág. 34.   En Pagán v. Fund. Hosp. Dr. Pila, 114 D.P.R. 224, 228-229 (1983), precisamos que "[d]esde 1949 lamentamos la ausencia de legislación en Puerto Rico que gobierne el arbitraje laboral".   Allí añadimos que ante la falta de aprobación de una ley detallada sobre la materia, entonces se "fuerza a este Tribunal a llenar el vacío existente".  Íd., pág. 229.

[50] D. M. Helfeld, El arbitraje obrero-patronal: por Demetrio Fernández Quiñones Forum (2000), 71 Rev. Jur. U.P.R. 191 (2002).

[51] 31 L.P.R.A. sec. 7.

cuando el proceso se ha desviado de forma sustancial y perjudicial de las reglas que gobiernan los procedimientos arbitrales.[52]   Por todo lo cual, en aquella ocasión enfatizamos en que los tribunales no deben permitir que se impugne un laudo a menos que se pueda levantar alguna de las objeciones antes mencionadas o que se alegue y pruebe la existencia de fraude, mala conducta o la comisión de un grave y perjudicial error equivalente a una violación del derecho a un debido procedimiento de ley.[53]

Ya a finales de la década del 40 resolvimos el caso normativo de Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., 69 D.P.R. 782 (1949), el cual muchos han nombrado como la "Ley de Arbitraje Obrero-Patronal de Puerto Rico" o la "Ley de Arbitraje Laboral de Puerto Rico".[54]   Entre otros

---

[52] Ríos v. Puerto Rico Cement Corp., 66 D.P.R. 470, 477 (1946).

[53] Íd., págs. 477-478.

[54] Fernández Quiñones, op. cit., págs. 11 y 529; Cancio, op. cit., pág. 28.   En dicho caso la parte peticionaria era la Junta de Relaciones del Trabajo de Puerto Rico (J.R.T.), en representación de la Unión de Empleados de Muelles de Puerto Rico (Unión), mientras que la parte recurrida era la New York & Porto Rico Steamship Co. (compañía). Específicamente, la J.R.T. solicitó que se pusiera en vigor un laudo de arbitraje mediante el cual se ordenaba la reposición de dos empleados en su empleo en la compañía y la paga retroactiva desde la fecha de suspensión de empleo.   Ambos empleados eran miembros de la Unión y se les acusó de haber hurtado de un muelle de la compañía dos cajas de mercancía que era parte de una carga interestatal.
    Luego de ser juzgados por la Corte de Distrito de los Estados Unidos para Puerto Rico, ambos acusados lograron la absolución, por lo que la Unión solicitó la reposición en el empleo y la paga retroactiva. No obstante, la compañía indicó que éstos no podían volver a ser empleados de dicha empresa.
    Conforme al convenio colectivo, la compañía y la Unión acordaron someter la controversia a arbitraje.   Luego de celebrar vistas, el Comité de Arbitraje concluyó que ambos individuos fueron negligentes en el desempeño de sus deberes, pero que tal actuación sólo justificaba una semana de suspensión (según las reglas de la compañía).   Así, dicho comité ordenó la reposición de ambos y la paga retroactiva luego de deducir el salario por una semana de suspensión.   Sin embargo, la

asuntos, allí expresamos que un laudo de arbitraje no es un contrato ni una sentencia, pero disfruta de la naturaleza de ambos.[55] Además, enumeramos las causales por las cuales se puede impugnar un laudo basado en una sumisión voluntaria, siendo éstas: (1) el fraude, (2) la conducta impropia, (3) la falta del debido procedimiento en la celebración de la vista, (4) la violación de la política pública, (5) la falta de jurisdicción, y (6) que el laudo no resuelva todas las cuestiones en controversia que se sometieron.[56]

A nivel federal, en 1957 el Tribunal Supremo de Estados Unidos resolvió el caso de Textile Workers Union of America v. Lincoln Mills of Ala.[57] En referencia a éste y al caso Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., supra, el profesor Helfeld señala que "[a]mbos casos han servido como la fuente fundamental para toda la jurisprudencia subsiguiente. Lo que ha creado la jurisprudencia de ambas jurisdicciones… es una política pública que favorece el desarrollo de un sistema de arbitraje para la resolución de disputas obrero-patronales paralelo al sistema judicial, funcionando con relativa

---

compañía no cumplió con el laudo de arbitraje y entonces la J.R.T. recurrió ante esta Curia.

[55] Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., 69 D.P.R. 782, 800 (1949). Véase, también, C.O.P.R. v. S.P.U., supra, pág. 29; VDE Corporation v. F&R Contractors, supra, pág. 29.

[56] Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., supra, pág. 800. Véanse, además: C.O.P.R. v. S.P.U., supra, pág. 30; S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832, 836 (1977).

[57] 353 U.S. 448 (1957).

autonomía y que puede contar con el apoyo judicial, siempre y cuando cumpla con unas normas fundamentales de naturaleza limitativa".[58]

Por su parte, en United Steelworkers v. Paula Shoe Co., Inc., 93 D.P.R. 661, 667 (1966), resolvimos que ningún error de hecho o de derecho del árbitro será motivo de impugnación excepto que cuando se incluya en el acuerdo de sumisión una disposición al efecto de que el árbitro deberá decidir conforme a derecho, entonces ese árbitro deberá seguir las normas de derecho y rendir el laudo de acuerdo con las doctrinas legales prevalecientes. Es decir, un laudo no podrá anularse debido a la existencia de meros errores de criterio, ya sean éstos en cuanto a la ley o en cuanto a los hechos.[59]

Al igual que en la jurisdicción federal, en Puerto Rico existe una fuerte política pública a favor del arbitraje como método alterno para la solución de conflictos.[60] No obstante, aun cuando existe esa política pública, el arbitraje sólo se utilizará si las partes así

---

[58] Helfeld, El arbitraje obrero-patronal: por Demetrio Fernández Quiñones Forum (2000), supra, pág. 195.

[59] Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., supra, pág. 800. Véanse, también: C.O.P.R. v. S.P.U., supra, págs. 30-31; Autoridad sobre Hogares v. Tribl. Superior , supra, pág. 353.

[60] Véanse: VDE Corporation v. F&R Contractors, supra, pág. 15; S.L.G. Méndez-Acevedo v. Nieves Rivera, supra, págs. 8 y 24; Quiñones v. Asociación, 161 D.P.R. 668, 673 (2004); Crufon Const. v. Aut. Edif. Públs., supra, pág. 205; Medina v. Cruz Azul de P.R., 155 D.P.R. 735, 738 (2001); U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133, 141 (1994); McGregor-Doniger v. Tribunal Superior, 98 D.P.R. 864, 869 (1970).

lo han pactado y en la forma en que lo han acordado.[61] Esto se debe a que como el arbitraje es un asunto de naturaleza contractual, no se puede obligar a una parte a someter una disputa al procedimiento de arbitraje si esa parte no lo ha pactado de esa forma. Dicha política pública está estrechamente relacionada con el principio de la autonomía de la voluntad contractual según enunciado en el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, el principio de *pacta sunt servanda* dispuesto en el Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2992, y el principio de la buena fe contractual.[62]

Como indicamos en Rivera v. Samaritano & Co., Inc.,[63] la distinción en la fuente de reglamentación del arbitraje obrero-patronal (regido por normas jurisprudenciales según la doctrina establecida en Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., *supra*) y el arbitraje comercial (regulado por la Ley 376) no altera la común naturaleza contractual de ambas instituciones. Allí planteamos que debido a que ambos tipos de arbitraje surgen de un convenio, tanto en uno como en otro los árbitros vienen obligados a respetar lo acordado; en su defecto, entonces

---

[61] Vivoni Farage v. Ortiz Carro, res. el 28 de septiembre de 2010, 2010 T.S.P.R. 206, pág. 19, 179 D.P.R. ___ ; S.L.G. Méndez-Acevedo v. Nieves Rivera, *supra*, pág. 9; Crufon Const. v. Aut. Edif. Púbs., *supra*, pág. 205; World Films, Inc. v. Paramount Pict. Corp., 125 D.P.R. 352, 361 (1990).

[62] Para una discusión sobre los principios mencionados, refiérase a VDE Corporation v. F&R Contractors, *supra*, págs. 12-13.

[63] 108 D.P.R. 604, 606-607 (1979).

queda libre la vía judicial para dar vigencia a la voluntad de las partes.[64]

En términos de la revisión judicial de un laudo arbitral, debemos mencionar que en nuestro ordenamiento jurídico se requiere que el laudo se dicte por escrito y que esté firmado por los árbitros o una mayoría de ellos.[65] No obstante, según resolvimos en Autoridad sobre Hogares v. Tribl. Superior,[66] los árbitros no vienen obligados a formular determinaciones de hechos ni conclusiones de derecho y tampoco tienen que expresar las razones de su fallo. Además, los árbitros no vienen compelidos a sustanciar la prueba bajo juramento ni a tomar la misma por escrito, así como tampoco tienen que hacer un expediente.[67] De igual manera, este Tribunal ha determinado que los árbitros tampoco vienen obligados a emitir sus laudos conforme a derecho, salvo pacto expreso en contrario.[68]

Esta Curia ha enfatizado que, como norma general, los laudos de arbitraje merecen de los tribunales una gran

---

[64] Rivera v. Samaritano & Co., Inc., 108 D.P.R. 604, 606-607 (1979).

[65] Véase Art. 20 de la Ley 376, 32 L.P.R.A. sec. 3220. El Art. XV del Reglamento para el orden interno de los servicios de arbitraje del Negociado de Conciliación y Arbitraje, Reglamento Núm. 6065, Departamento del Trabajo y Recursos Humanos, 23 de diciembre de 1999, pág. 9, dispone que "[e]l laudo arbitral deberá hacerse por escrito y estar firmado por el árbitro; sin embargo, si las partes lo solicitan y el árbitro accede a emitir una decisión oral en el acto, podrá así hacerlo y subsiguientemente confirmará su laudo por escrito".

[66] 82 D.P.R. 344, 361-362 (1961).

[67] Véase, también, C.R.U.V. v. Hampton Dev., supra, págs. 63-64.

[68] C.R.U.V. v. Hampton Dev., supra, pág. 64; Rivera v. Samaritano & Co., Inc., supra, pág. 609.

deferencia, salvo cuando se demuestre la existencia de alguna de las ya mencionadas causales para la impugnación de un laudo.[69] No obstante, dicha norma general tiene su excepción, siendo ésta que "los tribunales pueden intervenir y revisar si el convenio o acuerdo de sumisión, según sea el caso, consigna expresamente que el laudo sea resuelto conforme a derecho, y ello con referencia al derecho aplicable".[70] Así, pues, a través de los años hemos reiterado la regla de autorrestricción judicial de que no se revisará un laudo arbitral en cuanto al derecho o ley aplicable, salvo que determinada ley o las partes (en el acuerdo de sumisión o en el convenio colectivo) exijan que se resuelva conforme a derecho.[71]

Ahora bien, a los fines de un laudo de arbitraje, el término "conforme a derecho" se refiere a que "el árbitro [no] tiene autoridad para hacer caso omiso de las reglas de derecho sustantivo".[72] Por lo tanto, debe quedar claro que las decisiones emitidas por un árbitro que sean contrarias a las leyes y normas interpretativas de derecho sustantivo emitidas por el Tribunal Supremo de Estados Unidos y el Tribunal Supremo de Puerto Rico invalidan jurídicamente el

---

[69] J.R.T. v. Vigilantes, Inc., 125 D.P.R. 581, 592-593 (1990); J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 325 (1988).

[70] J.R.T. v. Junta Adm. Muelle Mun. de Ponce, *supra*, pág. 326.

[71] Colón Molinary v. A.A.A., 103 D.P.R. 143, 155 (1974). En su obra sobre arbitraje obrero-patronal, el profesor Fernández Quiñones afirma que "[l]a política judicial de autorrestricción no tiene cabida en aquellos casos donde las partes exigen que el laudo sea conforme a derecho". (Énfasis omitido.) Fernández Quiñones, op cit., pág. 584.

[72] Sonic Knitting Industries v. I.L.G.W.U., 106 D.P.R. 557, 580 (1977).

laudo arbitral cuando las partes han acordado que dicho laudo sea conforme a derecho.[73]

B. El procedimiento de arbitraje dispuesto por la Sec. 38 de la Ley de A.E.E.L.A.

Mediante la aprobación de la Ley Núm. 142 de 21 de diciembre de 1994, la Asamblea Legislativa incluyó en la Ley de A.E.E.L.A. un procedimiento de arbitraje para atender las impugnaciones de los candidatos en el proceso de elección de delegados y los puestos de sus Cuerpos Rectores. En la Exposición de Motivos de la ley, el legislador expuso que ante el problema en la solución de controversias relacionadas con el proceso de elección es importante que exista un mecanismo de resolución de disputas que tenga la confianza de todas las partes involucradas. Señaló el legislador que "[e]llo es tan o más necesario en una organización representativa, constituida democráticamente, donde existen diversidad de criterios, como es la Asociación".[74]

A través de la Sec. 38 de la Ley de A.E.E.L.A., *supra*, se crea un procedimiento de arbitraje mediante el cual se refiere la controversia al Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos, y allí se designa al Panel Independiente de Arbitraje (P.I.A.) para que atienda las impugnaciones de los candidatos. Dicho Panel estará compuesto por tres árbitros

---

[73] J.R.T. v. Vigilantes, Inc., *supra*, pág. 593. Véase, también, C.O.P.R. v. S.P.U., *supra*, págs. 31-32.

[74] Exposición de Motivos de la Ley Núm. 142 de 21 de diciembre de 1994.

que coticen al Fondo de Ahorro y Préstamos de la A.E.E.L.A., quienes serán nombrados por el Secretario del Departamento del Trabajo y Recursos Humanos no más tarde de treinta días laborables antes de la fecha de las elecciones.

En torno al proceso de impugnación de los candidatos en el proceso de elección de delegados, la mencionada sección de la Ley de A.E.E.L.A. establece que cualquier candidato podrá presentar una reclamación escrita ante el P.I.A., ello dentro de los próximos cinco días de efectuada la elección. Luego, a más tardar quince días después de presentarse la impugnación, el P.I.A. se reunirá para considerarla y notificará la decisión al reclamante dentro del término que no excederá los treinta días desde la fecha de presentación de la impugnación. Entonces, el candidato podrá solicitar la reconsideración ante el P.I.A. dentro del término de cinco días de haber recibido la notificación, por lo que dicho Panel reconsiderará y notificará su determinación dentro de un término que no excederá los diez días desde la fecha en que se presentó la petición de reconsideración.

Así, pues, cualquier candidato adversamente afectado por una resolución final u orden del P.I.A. podrá solicitar revisión judicial de dicha determinación ante el tribunal de primera instancia no más tarde de treinta días después de la notificación de la decisión del Panel.

Mediante la Sec. 38 de la Ley de A.E.E.L.A., *supra*, la Asamblea Legislativa delegó en la Junta de Directores de la Asociación la adopción de un proyecto de reglamento que regulara el trámite de referimiento al P.I.A. Posteriormente, ese proyecto sería presentado a la Asamblea de Delegados para su consideración y aprobación. Así, pues, dicha Asamblea de Delegados adoptó en 1995 el "Reglamento de Referimiento al Árbitro del Negociado del Conciliación y Arbitraje de los Procesos de Impugnación de Elección de los Delegados y de los Puestos de los Cuerpos Rectores de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico" (Reglamento de Referimiento al Árbitro). Entre otros asuntos, en dicho reglamento se incluyen disposiciones relacionadas con la designación del Panel, el procedimiento de impugnación, la determinación del Panel y la revisión judicial.

En lo pertinente, el Art. 8 del Reglamento de Referimiento al Árbitro establece que "[t]odas las decisiones del Panel serán por escrito e incluirán determinaciones de hechos y conclusiones de derecho". Mientras, el Art. 10 del mencionado Reglamento expone que "[c]ualquier candidato adversamente afectado por resolución final u orden del Panel podrá requerir revisión judicial de dicha resolución u orden al Tribunal de Primera Instancia…, en la sala correspondiente a la residencia de la parte agraviada, no más tarde de treinta (30) días después de la notificación de la decisión del Panel".

IV

A. El origen, propósito y estado actual de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico

Mediante la aprobación de la Ley Núm. 52 de 11 de julio de 1921 (Ley 52) se creó la institución llamada "Asociación, Fondo de Ahorro y Préstamo de los Empleados del Gobierno Insular de Puerto Rico" con el propósito principal de estimular el ahorro entre los empleados de gobierno y asegurarles contra accidentes, enfermedad y muerte. Luego, en virtud de la Ley Núm. 18 de 23 de abril de 1954, la Asamblea Legislativa modificó el nombre de la institución a la "Asociación de Empleados del Gobierno de Puerto Rico" y más de una década después se aprobó la Ley Núm. 133 de 28 de junio de 1966, conocida como la Ley de A.E.E.L.A., mediante la cual se derogó la Ley 52 y se dispuso sobre la continuación de la Asociación.

En First Federal v. Srio. de Hacienda, 86 D.P.R. 56, 70 (1962), expresamos que la Asociación es "una institución pública de carácter compulsorio para todos los empleados y funcionarios públicos del Gobierno de Puerto Rico". (Énfasis omitido.) Así, pues, la Asociación ordena el descuento de una cuota mensual de los sueldos de tales empleados y funcionarios públicos. Íd., pág. 71.

Al año siguiente, en 1963, resolvimos Berríos Miranda v. Asociación de Empleados, 88 D.P.R. 809 (1963). Allí expusimos que "[l]a Asociación existe como una entidad creada gubernamentalmente para fines de interés público,

como es la protección de nada menos que de los propios empleados gubernamentales". Íd., pág. 820. Además, hicimos claro que la Asociación no es un negocio privado ni tiene fines de lucro o especulación. Íd.

A pesar de que la Asociación es un organismo creado por ley, altamente reglamentado y con una finalidad pública establecida por el Gobierno de Puerto Rico, este Tribunal ha resuelto que ésta no puede considerarse como una agencia, departamento, instrumentalidad o corporación pública del Gobierno. Asoc. de Empleados del E.L.A. v. Vázquez, 130 D.P.R. 407, 429 (1992).[75] Asimismo, hemos reconocido que la Asociación no recibe ayuda económica del Gobierno de Puerto Rico y funciona de forma similar a una cooperativa de ahorro y crédito. Específicamente, la A.E.E.L.A. se nutre del salario mensual de los empleados públicos, ya que a éstos se les descuenta no menos del 3 por ciento de su salario mensual a través del Fondo de Ahorro y Préstamo. Íd., pág. 428.

B. El proceso de elección de delegados a la Asamblea de Delegados y de los candidatos a puestos directivos en los Cuerpos Rectores de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico

La Asociación es gobernada por una Asamblea de Delegados y administrada por una Junta de Directores, constituyendo ambas los Cuerpos Rectores de la Asociación. Según dispone la Sec. 5(a) de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862d, los empleados de cada agencia

---

[75] Véanse, además: Op. Sec. Just. Núm. 16 de 1988; Op. Sec. Just. Núm. 23 de 1967 y Op. Sec. Just. Núm. 10 de 1964.

gubernamental que pertenezcan a la matrícula de la Asociación celebrarán elecciones durante el mes de abril cada cuatro años, ello para elegir delegados por términos de cuatro años cada uno. Dicha elección será en proporción de un delegado en propiedad y un delegado suplente por cada mil o fracción de mil empleados cotizantes al Fondo de Ahorro y Préstamos, pero queda claro que ninguna agencia gubernamental podrá elegir más de quince delegados en propiedad. Íd. Mientras, los municipios en conjunto tendrán un delegado por cada mil o fracción de mil empleados cotizando ahorros hasta un máximo de quince delegados. Íd.

Tan pronto se realice la elección en cada agencia gubernamental, el jefe de ésta notificará los nombres de las personas electas al Presidente de la Asamblea de Delegados, dentro del término de diez días a partir de la fecha de la elección. Una vez se hayan elegido los delegados de no menos del 75% de todas las agencias gubernamentales, el Presidente convocará a la nueva Asamblea de Delegados. Sec. 5(a) de la Ley de A.E.E.L.A., *supra*. El sector de los ex empleados acogidos será convocado por el Presidente de la Junta de Directores de la A.E.E.L.A. y elegirá delegados en la misma forma y proporción provista para los empleados en servicio activo. Íd.

De acuerdo con la Ley de A.E.E.L.A., los jefes de las agencias gubernamentales serán los encargados de organizar

las elecciones dispuestas por dicha ley y a esos efectos crearán un Comité Organizador. Como parte de dicho Comité, los jefes de agencias deberán nombrar un Subcomité de Votación y Escrutinio, y un Subcomité de Impugnaciones, siendo este último el que deberá resolver -en el término de diez días laborables- cualquier querella que se presente por escrito en torno al proceso de candidaturas o elección. Sec. 5(a) de la Ley de A.E.E.L.A., *supra.*

Además, el estatuto deja establecido que ningún empleado podrá ser electo por más de dos términos consecutivos como miembro de la Asamblea de Delegados. Sec. 5(a) de la Ley de A.E.E.L.A., *supra.* A su vez, el estatuto dispone que la Asamblea de Delegados elegirá -de entre sus miembros- un presidente, un vicepresidente, un secretario y un macero, y también elegirá los miembros de la Junta de Directores. Íd.

Por su parte, la Sec. 5(b) de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862d, expone que la Junta de Directores de la Asociación estará compuesta por 17 miembros que serán elegidos por y de entre los delegados en propiedad electos a la Asamblea de Delegados. Por mandato de ley, en dicha Junta habrá un director que corresponda a la Rama Legislativa, uno a la Rama Judicial, doce a la Rama Ejecutiva, dos al sector de ex empleados acogidos y uno a los municipios. Íd.

Asimismo, queda claro que ninguna agencia gubernamental tendrá más de un miembro en la Junta de

Directores, que los miembros de dicha Junta serán electos por un término de cuatro años y ninguno de ellos servirá por más de dos términos consecutivos. Sec. 5(b) de la Ley de A.E.E.L.A., *supra*. Se señala también que la Junta elegirá -de entre sus miembros- un presidente, un vicepresidente y un secretario.

C. Los términos de "empleado", "matrícula" y "agencia gubernamental" en la Ley de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico

El inciso (b) de la Sec. 2 de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862a, recoge la definición del término "empleado". En lo pertinente, allí se dispone lo siguiente:

> (b) Empleado.- Significará todo funcionario o empleado permanente o regular que como tal reciba un sueldo del Gobierno del Estado Libre Asociado de Puerto Rico o de sus instrumentalidades que pertenezca a la matrícula de la Asociación y el personal permanente de la Asociación….

De la definición anterior se desprende que hay dos categorías de empleados para fines de la Ley de A.E.E.L.A., éstas son: (1) los funcionarios o empleados permanentes o regulares que reciban un sueldo del Gobierno del Estado Libre Asociado de Puerto Rico o de sus instrumentalidades que pertenezcan a la matrícula de la Asociación, y (2) el personal permanente de la Asociación.

La Ley de A.E.E.L.A. también establece quiénes componen la matrícula de dicha Asociación. En lo pertinente, la Sec. 4 de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862c, establece que:

> La matrícula de la Asociación comprenderá a todos los empleados y ex empleados, según éstos son

definidos más adelante en las secs. 862 a 863p de este título, de agencias gubernamentales existentes o que se crearen en lo sucesivo, incluyendo a los municipios de Puerto Rico.

A los efectos de la participación en los beneficios de la Asociación la matrícula se dividirá en las siguientes categorías:

........

(4) Socios acogidos al seguro por muerte.- Esta categoría comprenderá a los empleados asegurados que al separarse definitivamente del servicio de cualquier agencia gubernamental queden, a petición propia, acogidos al seguro por muerte. (Énfasis suplido.)

De igual forma, el inciso (l) del Art. III del Reglamento de la Asamblea de Delegados de la Asociación de Empleados del Estado Libre Asociado de Puerto Rico dispone que "matrícula" significará "la matrícula de la Asociación que comprende a todos los empleados y ex-empleados acogidos al Seguro por Muerte de agencias gubernamentales existentes o que se crearen en lo sucesivo, incluyendo los municipios de Puerto Rico".

A su vez, el inciso (c) de la Sec. 2 de la Ley de A.E.E.L.A., 3 L.P.R.A. sec. 862a, define el término "agencia gubernamental" de la forma siguiente:

(c) Agencia gubernamental.- Significará todo departamento, agencia, instrumentalidad, autoridad o corporación pública del Estado Libre Asociado de Puerto Rico existente o que se creare en el futuro. Se considerarán, además, como agencia gubernamental el Tribunal Supremo de Puerto Rico, el Tribunal de Circuito de Apelaciones, el Tribunal de Primera Instancia, la Oficina de Administración de los Tribunales, el Senado, la Cámara de Representantes, la Oficina del Contralor, la Oficina del Procurador del Ciudadano, la Universidad de Puerto Rico y los gobiernos municipales. Cuando hayan (sic) varias agencias y oficinas bajo un mismo departamento, se entenderá que todos y cada uno de ellos forman una sola agencia gubernamental, conforme a las leyes y los planes de reorganización gubernamental aprobados por la Asamblea Legislativa y vigentes a la fecha de

la elección.   A los efectos de este capítulo todos los municipios se considerarán en conjunto y como una sola agencia gubernamental.

En la versión original de la Ley de A.E.E.L.A., aprobada el 28 de junio de 1966, se incluyó de manera expresa a la Asociación dentro de la definición de "agencia gubernamental".[76]   No obstante, al año siguiente se aprobó la Ley Núm. 134 de 14 de junio de 1967 mediante la cual se excluyó a la A.E.E.L.A. de la mencionada definición.   Dicha exclusión fue propuesta por la Comisión de Gobierno de la Cámara de Representantes de Puerto Rico, ello mediante el P. de la C. Núm. 774 de 1967.   En las explicaciones sobre el alcance de la medida, la Comisión de Gobierno de la Cámara de Representantes expresó lo siguiente:

> El propósito del proyecto bajo consideración es corregir varias referencias erróneas que se hacían a diferentes secciones de la ley, aclarar el significado de términos utilizados en la misma y suplir criterios que facilitan la administración de la Asociación de Empleados del Estado Libre Asociado.
> ........
> El proyecto excluye a la misma Asociación de Empleados en su definición de ´Agencia Gubernamental´. Con esto se evita que los empleados de la Asociación tengan representación en la Asamblea de Delegados y que surja la situación an[ó]mala de que un subalterno del Director Ejecutivo de la Asociación forme parte de la

---

[76] La versión original del inciso (c) de la Sec. 2 de la Ley de A.E.E.L.A. leía de la siguiente forma:
(c) Agencia gubernamental significará todo departamento, agencia, instrumentalidad, autoridad o corporación pública del Estado Libre Asociado de Puerto Rico. Se considerarán, además, como agencia gubernamental el Tribunal Supremo de Puerto Rico, el Tribunal Superior, el Tribunal de Distrito, el Senado, la Cámara de Representantes, la Oficina del Contralor, la Policía de Puerto Rico, la Universidad de Puerto Rico, la Asociación [de Empleados del Estado Libre Asociado de Puerto Rico] y los gobiernos municipales que previa ordenanza adoptada regularmente así lo soliciten. (Énfasis nuestro.)

Junta de Directores o de la Asamblea de Delegados.
(Énfasis suplido.)[77]

Por su parte, previo estudio y consideración del P. de la C. Núm. 774 de 1967, la Comisión del Trabajo del Senado reiteró la posición de la Cámara de Representantes. En su informe, dicha Comisión expresó lo siguiente:

De acuerdo a la medida no se permitirá que los empleados de la Asociación formen parte de la Asamblea de Delegados o de la Junta de Directores. Esto evita el posible conflicto que pudiera surgir, si un empleado de la Asociación fuera electo a la Junta de Directores, estando así por encima de su jefe en la Asociación.[78]

En una Opinión emitida en 1974 por el entonces Secretario de Justicia, Lcdo. Franscisco De Jesús Schuck, éste planteó lo siguiente en torno a la matrícula de la A.E.E.L.A.: "La sección que reglamenta la composición de la Matrícula de la Asociación clara y expresamente la *limita a todos los empleados y ex empleados de 'agencias gubernamentales'*". (Énfasis en el original.) [79] Más adelante, el entonces Secretario añadió las expresiones siguientes:

No tenemos duda alguna que el propósito del legislador fue el de excluir la "Asociación" de la definición del término "agencia gubernamental", de forma tal que los empleados de dicha Asociación no formaran parte de la matrícula de la Asociación, ni tuvieran derecho a estar representados en alguno o ambos de sus cuerpos rectores. Fue muy cuidadoso el legislador al expresar las razones que para ello tenía.
........
Ante una intención legislativa tan clara, no es posible concluir que los empleados de la Asociación de

---

[77] 21 Diario de Sesiones de la Asamblea Legislativa 1048 (1967).

[78] 21 Diario de Sesiones de la Asamblea Legislativa 1391 (1967).

[79] Op. Sec. Just. Núm. 14 de 1974.

> Empleados del Estado Libre Asociado tengan derecho a estar representados en la Asamblea de Delegados de dicha Asociación, aun cuando dicha representación se limitara a ese cuerpo rector únicamente. Lo cierto es que la ley que nos ocupa no les garantiza ese derecho en la actualidad. Sí podrán esos empleados, para todos los efectos, disfrutar de los beneficios que la Asociación persigue dentro de sus fines, pero en términos de una representación en alguno o ambos de sus cuerpos rectores, la contestación es en la negativa. (Énfasis suplido.)[80]

## D. La Ley del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico

Mediante la Ley del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (Ley del Sistema de Retiro del Gobierno),[81] se creó un sistema de retiro y beneficios que se considerará un fideicomiso. Según el Art. 1-101 de la mencionada ley, 3 L.P.R.A. sec. 761, los fondos de dicho sistema de retiro se utilizarán y aplicarán "en provecho de los miembros participantes de su matrícula, sus dependientes y beneficiarios, para el pago de anualidades por retiro y por incapacidad, anualidades y beneficios por defunción y otros beneficios, una vez satisfechos los requisitos que más adelante se establecen, para en esta forma conseguir economía y eficiencia en el funcionamiento del Gobierno del Estado Libre Asociado de Puerto Rico".

El inciso (c) del Art. 1-105 de la Ley del Sistema de Retiro del Gobierno, 3 L.P.R.A. sec. 764, dispone que para los efectos de la matrícula del sistema de retiro de

---

[80] Op. Sec. Just. Núm. 14 de 1974.

[81] Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. sec. 761 *et seq.*

empleados "la Asociación de Empleados del Estado Libre Asociado de Puerto Rico se considerará como una empresa pública". En lo pertinente, el inciso (4) del Art. 1-104 de dicha ley, 3 L.P.R.A. sec. 763, define que "empresa pública" será "toda instrumentalidad gubernamental del Estado Libre Asociado de Puerto Rico, que haya sido creada o que en el futuro se creare".

V

## A. La interpretación de las leyes (la hermenéutica legal)

Según los tratadistas Bernier y Cuevas Segarra, la hermenéutica legal es el proceso de interpretar las leyes, lo que comprende el auscultar, averiguar, precisar y determinar cuál ha sido la voluntad legislativa, esto es, qué es lo que ha querido decir el legislador.[82] En varias ocasiones este Foro ha señalado que en nuestra función de interpretar la ley sólo existe una regla absolutamente invariable: debe descubrirse y hacerse cumplir la verdadera intención y deseo del Poder Legislativo.[83] Es por ello que hemos reiterado que constituye un principio cardinal de hermenéutica el que los tribunales, al interpretar una disposición específica de una ley, deben siempre considerar

---

[82] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241.

[83] Lange v. El Pueblo, 24 D.P.R. 854, 858 (1917). Véanse, además: Quiñones v. Asociación, 161 D.P.R. 668, 676 (2004); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 538 (1999).

cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla.[84]

Hemos dejado claro que los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones, supliendo así las posibles deficiencias cuando esto fuere necesario. [85] Bernier y Cuevas Segarra nos plantean que todo estatuto debe ser examinado en su totalidad para determinar el significado de cada una de sus partes, pues con ello se persiguen dos propósitos: (1) aclarar ambigüedades, y (2) hacer de la ley un todo armónico y efectivo.[86] Añaden que "[n]o se pueden tomar aisladamente los distintos apartados de la ley, sino que deben tomarse todos en conjunto, o sea, íntegramente".[87]

---

[84] Soc. Asist. Leg. v. Ciencias Forenses, res. el 16 de septiembre de 2010, 2010 T.S.P.R. 196, pág. 15, 179 D.P.R. ___ ; Pizarro v. Nicot, 151 D.P.R. 944, 951 (2000); Farmacias Moscoso, Inc. v. K-Mart Corp., 138 D.P.R. 497, 501-502 (1995); González Pérez v. E.L.A., 138 D.P.R. 399, 405 (1995).
   Según nos señalan Bernier y Cuevas Segarra, el propósito de la acción legislativa puede ser corregir un mal, alterar una situación existente, complementar una reglamentación vigente, fomentar algún bien específico o el bienestar general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno. Véase Bernier y Cuevas Segarra, op. cit., págs. 245-246.

[85] Pizarro v. Nicot, supra, pág. 502; Farmacias Moscoso, Inc. v. K-Mart Corp., supra, pág. 502.

[86] Bernier y Cuevas Segarra, op. cit., pág. 315.

[87] Íd. Véanse, también: Bomberos Unidos v. Cuerpo Bomberos et al., res. el 26 de enero de 2011, 2011 T.S.P.R. 12, pág. 30, 180 D.P.R. ___ ; Asoc. Fcias. v. Caribe Specialty et al. II, res. el 23 de septiembre de 2010, 2010 T.S.P.R. 204, pág. 18, 179 D.P.R. ___ ; Soc. Asist. Leg. v. Ciencias Forenses, supra, pág. 17; S.L.G. Semidey Vázquez v. ASIFAL, res. el 22 de diciembre de 2009, 2009 T.S.P.R. 184, pág. 10, 177 D.P.R. ___ .

Por último, acogemos las expresiones de Bernier y Cuevas Segarra en el sentido de que los tribunales, en el desempeño normal de sus funciones, están obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. Señalan, además, que interpretar una ley en forma contraria a la intención legislativa implica la usurpación por la Rama Judicial de las prerrogativas de la Rama Legislativa. Es por ello que el intérprete de la ley debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable.[88]

VI

Con el propósito de hilvanar de una forma más lógica la discusión de los señalamientos de error planteados por la parte peticionaria -la A.E.E.L.A.-, procederemos a discutir en primera instancia y de manera conjunta (por estar estrechamente relacionados entre sí) el segundo y tercer señalamiento, y luego el primer señalamiento de error. Es decir, primero analizaremos el alcance de la revisión judicial dispuesta en la Sec. 38 de la Ley de A.E.E.L.A., *supra*, y luego expondremos sobre si los ex empleados de la A.E.E.L.A. pertenecen a la matrícula de dicha Asociación.

---

[88] Bernier y Cuevas Segarra, op. cit., pág. 299.

Como mencionamos anteriormente, fue mediante la aprobación de la Ley Núm. 142 de 21 de diciembre de 1994 que se incluyó el procedimiento de arbitraje en la Ley de A.E.E.L.A., ello "para atender las impugnaciones de los candidatos en el proceso de elección de los delegados y los puestos de sus [c]uerpos [r]ectores".[89] En aquella ocasión el legislador entendió que era necesario crear un mecanismo de resolución de disputas para enfrentar el problema existente en la solución de controversias relacionadas con el proceso de elecciones en la Asociación. Así, pues, la Asamblea Legislativa concibió un procedimiento de arbitraje referido al Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos,[90] y allí se designaría al P.I.A. para atender las impugnaciones.

Es la Sec. 38 de la Ley de A.E.E.L.A., *supra*, la que establece el procedimiento de arbitraje y reconoce la revisión judicial. Allí claramente se plantea que cualquier candidato adversamente afectado por una resolución final u orden del P.I.A. podrá solicitar revisión judicial no más tarde de treinta días luego de la notificación de la determinación del árbitro. Así también se dispuso en el Art. 10 del Reglamento de

---

[89] Exposición de Motivos de la Ley Núm. 142 de 21 de diciembre de 1994.

[90] Según hemos reconocido, el Negociado de Conciliación y Arbitraje constituye un organismo al cual las partes acuden voluntariamente para resolver una disputa obrero-patronal. Asimismo, este Tribunal ha afirmado que el Negociado no es una parte en el pleito ni tampoco es el representante legal de ninguna de las partes. Hosp. del Maestro v. U.N.T.S., 151 D.P.R. 934, 942-943 (2000); Corp. Créd. Des. Com. Agrícola v. U.G.T., 138 D.P.R. 490, 495 (1995).

Referimiento al Árbitro.  No obstante, es el Art. 8 del mencionado Reglamento el que abunda sobre cómo serán esas decisiones del P.I.A. al exponer que éstas "serán por escrito e incluirán determinaciones de hechos y conclusiones de derecho".

De una lectura integral de la mencionada Sec. 38 se puede identificar la especificidad y particularidad del procedimiento de arbitraje que el legislador integró a la Ley de A.E.E.L.A.  Asimismo, se pueden reconocer unas diferencias, que podríamos catalogar como "abismales", con el procedimiento de arbitraje que se emplea en las controversias de naturaleza comercial y en las disputas obrero-patronales.  Veamos algunas de estas diferencias.

En primer lugar, en nuestro ordenamiento jurídico tanto el arbitraje comercial como el arbitraje obrero-patronal son tipos de arbitraje de carácter voluntario, o sea, que ocurren por voluntad de las partes. No obstante, el procedimiento de arbitraje dispuesto en la Sec. 38 de la Ley de A.E.E.L.A., *supra*, claramente constituye un arbitraje de carácter obligatorio o le podríamos llamar un "arbitraje compulsorio legislativo" (concepto que acuñamos en 1974 en Colón Molinary v. A.A.A., *supra*).

En segundo lugar, como resolvimos en Autoridad sobre Hogares v. Tribl. Superior, *supra*, los árbitros no vienen obligados a formular determinaciones de hechos ni

conclusiones de derecho, sin embargo el Art. 8 del Reglamento de Referimiento al Árbitro dispone expresamente que las decisiones del P.I.A. "serán por escrito e incluirán determinaciones de hechos y conclusiones de derecho". (Énfasis suplido.)

En tercer lugar, otra gran diferencia se refiere a la finalidad y obligatoriedad de la decisión emitida por el árbitro o panel de árbitros. En el caso del arbitraje comercial y el arbitraje obrero-patronal, la revisión judicial del laudo arbitral es casi inexistente debido a la norma de autorrestricción o abstención judicial.[91] Los tribunales sólo podrán revisar los laudos arbitrales si existe alguno de los fundamentos dispuestos por ley (en el arbitraje comercial) o la jurisprudencia (en el arbitraje obrero-patronal) que permita la impugnación de dicho laudo.[92] Mientras, ni la Sec. 38 de la Ley de A.E.E.L.A. ni el Reglamento de Referimiento al Árbitro establecen causales para la impugnación del laudo del P.I.A., sino que sólo se limitan a establecer de forma general los remedios de la reconsideración y la revisión judicial.

---

[91] Fernández Quiñones, op cit., pág. 25. Véase, además, Vivoni Farage v. Ortiz Carro, supra, pág. 20.

[92] Véase la Parte III, Sección A, de esta Opinión para los fundamentos de revocación del laudo arbitral en el arbitraje comercial y el arbitraje obrero-patronal.

El Art. XV del Reglamento para el orden interno de los servicios de arbitraje del Negociado de Conciliación y Arbitraje, supra, pág. 10, establece que "[l]a decisión emitida por el árbitro será final y obligatoria para las partes y no podrá ser objeto de reconsideración por éste, excepto cuando el convenio colectivo así lo estipule o cuando ambas partes así lo acuerden".

Por último, en el contexto del arbitraje comercial y el arbitraje obrero-patronal, hemos señalado que los árbitros no vienen obligados a emitir sus laudos conforme a derecho, salvo pacto expreso en contrario.[93] No obstante, tanto la Sec. 38 de la Ley de A.E.E.L.A., *supra*, como el Reglamento de Referimiento al Árbitro nada disponen acerca de si los laudos del P.I.A. serán o no conforme a derecho.

Al examinar minuciosamente la Sec. 38 de la Ley de A.E.E.L.A., *supra*, así como el Reglamento de Referimiento al Árbitro nos damos cuenta de que el procedimiento de arbitraje creado por el legislador a través de la Ley 142 tiene unas características muy particulares. Ahora bien, con relación a si el procedimiento de arbitraje estatuido en la Ley de A.E.E.L.A. es un procedimiento ordinario o *sui géneris*, aunque -como ya hemos descrito- tal procedimiento goza de múltiples características particulares, resulta innecesario en esta ocasión definirlo en una u otra forma.

Luego de un análisis conjunto de la Sec. 38 de la Ley de A.E.E.L.A., *supra*, y el Art. 10 del Reglamento de Referimiento al Árbitro, entendemos que hubo una intención inequívoca del legislador y de la Asamblea de Delegados de la A.E.E.L.A. en cuanto a permitir una revisión judicial plena de las resoluciones finales u órdenes del P.I.A.,

---

[93] C.R.U.V. v. Hampton Dev., *supra*. En U.C.P.R. v. Triangle Engineering Corp., *supra*, pág. 143 n. 7, expresamos que "cuando las partes acuerden que los asuntos sometidos a arbitraje sean resueltos con arreglo a derecho, el tribunal puede revisar los méritos jurídicos del laudo". Véanse, además, Vivoni Farage v. Ortiz Carro, *supra*, pág. 20; Rivera v. Samaritano & Co., Inc., *supra*, pág. 608.

ya que en ninguna parte de la Sec. 38 ni en el mencionado artículo se establece alguna limitación a la revisión judicial, en términos de establecer causales o fundamentos por los cuales se pueda impugnar la decisión del P.I.A. Ello contrario al arbitraje comercial cuyas causales de impugnación están incluidas en el Art. 22 de la Ley de Arbitraje Comercial, *supra*, y en el arbitraje obrero-patronal las causales son las expuestas en Junta Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., *supra*.

Entendemos que si el legislador y la Asamblea de Delegados de la A.E.E.L.A. hubieran querido limitar el derecho a la revisión judicial de los laudos arbitrales del P.I.A., entonces hubieran establecido expresamente las causales de impugnación al amparo de las cuales las personas adversamente afectadas pudieran revisar dichos laudos. Así, pues, se puede razonablemente deducir que tanto la Asamblea Legislativa como la Asamblea de Delegados de la A.E.E.L.A. consideraron que las determinaciones del P.I.A. fueran conforme a derecho, permitiendo así que las partes adversamente afectadas acudan al foro judicial y éste revise plenamente los méritos de las decisiones incluyendo cualquier error en la aplicación del derecho. O sea, la revisión judicial del laudo arbitral del P.I.A. se extenderá a revisar la corrección jurídica del laudo.

Vale mencionar que el mismo Tribunal de Apelaciones reconoció que "[e]n la medida en que la propia ley habilitadora de AEELA exige que el PIA establezca

determinaciones de hechos y conclusiones de derecho en todo laudo, nos indica que el arbitraje es uno conforme a derecho, porque de lo contrario tales requisitos no tendrían significado alguno".[94]  No cabe duda de que el requisito de consignar las determinaciones de hechos y conclusiones de derecho en todas las determinaciones del P.I.A. responde al propósito de facilitar el proceso de revisión judicial que garantiza la Sec. 38 de la Ley de A.E.E.L.A., *supra*.

Por todo lo anterior, en cuanto al segundo y tercer señalamiento, concluimos que el Tribunal de Apelaciones erró al denegar la expedición del recurso de *certiorari* presentado por la A.E.E.L.A. por entender que el foro de instancia no había errado al respetar la norma de abstención judicial ante la alegada falta de fundamentos para revisar el laudo arbitral emitido por el P.I.A.  Como señalamos, la Sec. 38 de la Ley de A.E.E.L.A., *supra*, y el Reglamento de Referimiento al Árbitro reflejan la intención de que el laudo emitido por el P.I.A. sea conforme a derecho, por lo que el tribunal podrá revisar los méritos jurídicos del laudo arbitral.

En cuanto al primer señalamiento de error, es imperativo referirse a las Secs. 2 y 4 de la Ley de A.E.E.L.A., *supra*.  En particular, la Sec. 4 expone que "[l]a matrícula de la Asociación comprenderá a todos los empleados y ex empleados… de agencias gubernamentales existentes o que se crearen en lo sucesivo…" y que los

_____
[94] Apéndice de la Petición de *certiorari*, pág. 29.

socios acogidos al seguro por muerte son "los empleados asegurados que al separarse definitivamente del servicio de <u>cualquier agencia gubernamental</u> queden, a petición propia, acogidos al seguro por muerte". (Énfasis suplido.)

Mientras, el inciso (c) de la Sec. 2 de la Ley de A.E.E.L.A., *supra*, define de forma precisa el término "agencia gubernamental" y no incluye en ésta a la Asociación. Como señalamos, en la versión original de la Ley de A.E.E.L.A. sí se incluyó a la A.E.E.L.A. en el término "agencia gubernamental", pero fue excluida mediante la aprobación de la Ley Núm. 134 de 14 de junio de 1967.

No obstante, los recurridos plantean que no les aplica la definición de "socio acogido al seguro por muerte", sino la expuesta en el inciso (e) de la Sec. 2 de la Ley de A.E.E.L.A., *supra*, referente a "socio acogido pensionado". Allí se plantea que un socio acogido pensionado es "todo ex empleado acogido al seguro por muerte y que esté recibiendo una pensión de cualquiera de los sistema de retiro de empleados públicos…". Ante la claridad de la disposición sobre la composición de la matrícula de la Asociación (Sec. 4 de la Ley de A.E.E.L.A., *supra*) de ninguna manera podemos acoger el planteamiento de los recurridos, pues hacerlo sería desvirtuar la letra clara del estatuto y echar a un lado la intención del legislador.

Según surge de la determinación del Tribunal de Apelaciones, dicho foro apelativo interpretó que los ex empleados de A.E.E.L.A. pertenecen a la matrícula de la

Asociación por motivo de que están acogidos al sistema de retiro de los empleados del Gobierno de Puerto Rico y que no existe diferencia entre los ex empleados de las agencias gubernamentales y los ex empleados de la Asociación. [95] Sin embargo, entendemos que dicha interpretación es errónea y no podemos validarla debido a que está claro que el estatuto que regula quiénes pertenecen a la matrícula de la Asociación es la propia Ley de A.E.E.L.A. y nada tiene que ver la Ley del Sistema de Retiro del Gobierno. Debe quedar claro que una cosa es la matrícula del sistema de retiro de empleados de gobierno, en la cual está incluida la A.E.E.L.A. como una "empresa pública", y otra muy diferente es la matrícula de la Asociación, en la cual está excluida la A.E.E.L.A. como una "agencia gubernamental", por lo que están excluidos los empleados y ex empleados acogidos de dicha Asociación. El inciso (c) del Art. 1-105 de la Ley del Sistema de Retiro del Gobierno, *supra*, aclara que la A.E.E.L.A. se considerará como una "empresa pública" <u>sólo para los efectos</u> de la matrícula del sistema de retiro de empleados. (Énfasis suplido.)

Entonces, es importante recalcar que el reconocimiento y legitimación como miembros de un sector de la Asociación, en este caso el sector de ex empleados acogidos al seguro

---

[95] El Tribunal de Apelaciones expresó lo siguiente:
 "Está claro que una vez se jubilan, los empleados de AEELA son jubilados dentro del plan de retiro del gobierno de Puerto Rico, con iguales prerrogativas, derechos y obligaciones que todos los demás jubilados allí adscritos. Es decir, una vez jubilado el empleado del ELA, al igual que el empleado de AEELA, gozan de los mismos derechos y prerrogativas, sin distinción alguna".
Apéndice de la Petición de *certiorari*, pág. 28.

por muerte, lo otorga la misma Ley de A.E.E.L.A. y no la Ley del Sistema de Retiro del Gobierno.

Claro está, no debe haber duda de que el legislador puede conceder beneficios a los empleados y ex empleados de la A.E.E.L.A. dentro del marco estrictamente laboral, pero en cuanto a la integración a la matrícula y la representación en los Cuerpos Rectores de la Asociación el legislador ha sido claro al excluir a los empleados y ex empleados de la A.E.E.L.A. Si la intención del legislador fuera incluirlos como parte de la matrícula, entonces debería incluir a la A.E.E.L.A. en la definición de "agencia gubernamental". Sin embargo, hasta el momento esto no ha ocurrido. Por tanto, es nuestro deber hacer cumplir la disposición estatutaria y ceñirnos a lo dispuesto en la misma.

Concluimos, entonces, que los ex empleados de la A.E.E.L.A. no pertenecen a la matrícula de dicha Asociación, específicamente al sector de ex empleados acogidos al seguro por muerte de la A.E.E.L.A. y, por consiguiente, no tienen derecho a participar como votantes y a aspirar como candidatos en el proceso de elección de los delegados que representarán al mencionado sector de ex empleados en la Asamblea de Delegados de la A.E.E.L.A.

VII

Por todo lo anterior, concluimos que incidió el Tribunal de Apelaciones al denegar la expedición del recurso presentado por la Asociación. Expedido el auto solicitado,

se revoca la resolución recurrida y aquella emitida por el Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.


                                    Erick V. Kolthoff Caraballo
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Juan L. Aquino González y otros

    Recurridos

        v.                  CC-2007-201     Certiorari

Asociación de Empleados del
Estado Libre Asociado de
Puerto Rico y otros

    Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 25 de mayo de 2011.

     Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la resolución recurrida y aquella emitida por el Tribunal de Primera Instancia.

     Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta concurre con la parte III de la Opinión y disiente en cuanto a lo demás.

                Aida Ileana Oquendo Graulau
              Secretaria del Tribunal Supremo